UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


SHERRY L. STARKEY,

       Plaintiff,

v.                                              Case No. 1:06-cv-693
                                              Hon. Janet T. Neff

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for disability insurance benefits (DIB) and supplemental security income (SSI).

Plaintiff was born on November 5, 1962 and completed two years of college (AR 62, 86).[1] Plaintiff alleges that she has been disabled since April 7, 2003 (AR 62).[2] She had previous employment as a teacher assistant for special needs children (AR 89). Plaintiff identified her disabling conditions as anxiety and panic attacks, an injured elbow and hip (AR 80). After administrative denial of plaintiff's claim, an Administrative Law Judge (ALJ) reviewed plaintiff's claim *de novo* and entered a decision denying these claims on December 19, 2005 (AR 15-24). This

---

[1] Citations to the administrative record will be referenced as (AR "page #").

[2] The court notes that plaintiff filed three previous claims for benefits. Her May 22, 1990 application for SSI was denied on April 17, 1991 (AR 15). Her August 28, 1992 application for SSI was granted, and she was found disabled as of August 1, 1992 (AR 15). Plaintiff was paid benefits through November 1992, when her benefits were terminated due to excess income (AR 15). Finally, plaintiff's February 22, 2002 application for SSI was denied on July 24, 2002 (AR 15).

decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I.  LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence.  42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).   A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only.  This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).  The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record.  *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence.  *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §§ 404.1505 and 416.905; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases. *See Bailey v. Secretary of Health and Human Servs.*, No. 90-3265,

1991 WL 310 at * 3 (6th Cir. Jan. 3, 1991). "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993). *See Brooks v. Sullivan*, No. 90-5947, 1991 WL 158744 at *2 (6th Cir. Aug. 14,1991) ("[t]o establish medical eligibility for SSI, plaintiff must show either that he was disabled when he applied for benefits . . . or that he became disabled prior to the Secretary's issuing of the final decision on this claim . . . 20 C.F.R. §§ 416.335, 416.330").

## II.  ALJ'S DECISION

Plaintiff's claim failed at the fifth step of the evaluation. Following the five steps, the ALJ initially found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability (AR 23). Second, the ALJ found that she suffered from a severe impairment of an anxiety disorder (AR 23). At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (AR 23).

The ALJ decided at the fourth step that plaintiff had a residual functional capacity (RFC) as follows:

> The claimant has no exertional or physical limitations. She is limited to simple routine tasks involving no more than simple, short instructions and simple work-related decisions with few workplace changes. She may have no interaction with the public, and only occasional interaction with co-workers and supervision.

(AR 23). The ALJ found that plaintiff could not perform her past relevant work (AR 24). The ALJ also found that plaintiff's allegations regarding her limitations are not totally credible (AR 23).

At the fifth step, the ALJ determined that plaintiff had the RFC to perform a significant range of heavy work (AR 24). The ALJ found that there are a significant number of jobs

4

in the national economy that she can perform, including assembler (18,500 light jobs) and machine tender (8,800 jobs) (AR 24). Accordingly, the ALJ determined that plaintiff was not under a "disability" as defined by the Social Security Act and entered a decision denying benefits (AR 24).

### III. ANALYSIS

Plaintiff raised three issues on appeal.

**A. By failing to recontact the unrepresented claimant's treating physician and requesting an opinion as to her limitations, did the ALJ deprive her of a fair hearing?**

Plaintiff chose to represent herself at the administrative hearing level (AR 302-303). Now, she contends that the ALJ failed to properly develop the record, because he did not re-contact a treating physician. Specifically, plaintiff contends that a physician would have rendered an opinion that her fibroid tumors prevent her from working three or four days per month. Plaintiff's Brief at 13.

The ALJ has a "special duty" to develop the administrative record and ensure a fair hearing for claimants that are unrepresented by counsel. *See Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); *Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983) (ALJ must scrupulously and conscientiously explore all the relevant facts when adjudicating claims brought by unrepresented claimant). In determining whether it is necessary to remand for a clarification of the record, the court is guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice. *See Bailey v. Barnhart*, 39 Fed. Appx. 430, 434-35 (7th Cir. 2002); *Brown v. Shalala*, 44 F.3d 931, 935-36 (11th Cir. 1995). Absent a gap in the record, the ALJ has no duty to recontact the physician. *See Johnson v. Barnhart*, 138 Fed. Appx. 186, 189 (11th Cir. 2005); *Bailey*, 39 Fed. Appx. at 434-35. *See also*, 20 C.F.R. §

404.1512(e) (the Commissioner will recontact a medical source "[w]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled").

Plaintiff testified that her fibroid tumors interfered with her ability to work (AR 313-14). Specifically, that she has excessive bleeding for seven to ten days, and that she has "to stay home for the first few days and usually put [her] feet up" (AR 319).[3] In October 2004, plaintiff reported to her family physician, Thomas Smith, M.D., that her periods were irregular "sometimes heavy, sometimes not so heavy" (AR 257). Plaintiff saw a gynecologist, Richard Tomczyk, D.O., in December 2004 regarding her heavy bleeding lasting 10 to 23 days (AR 239). Dr. Tomczyk noted that plaintiff had uterine fibroids (AR 227, 229). The doctor also observed that plaintiff's complaints coincided with a number of events:

> At this time, she is in college and is in the midst of final examinations. She is also in the process of losing her home and will soon be starting an externship and she also needs a job. The patient is also very fearful of surgery.

(AR 229). Dr. Tomczyk recommended various treatments, including injections, laparoscopic surgery, uterine artery embolization, and a hysterectomy (AR 239, 319-21). However, plaintiff did not agree to any of these treatments, and the doctor released her with instructions to see him on an as-needed basis (AR 239). Dr. Tomczyk noted that plaintiff called off surgery scheduled for December 28, 2004, because she was getting married on December 23rd and her husband would be using his time off to spend on the honeymoon (AR 239).

Plaintiff testified that she sought a second opinion from another gynecologist, Dr. Novack (AR 320). Dr. Tomczyk reported plaintiff's response to this second opinion as follows:

---

[3] The court notes that the ALJ sometimes refers to the fibroid tumors as "thyroid tumors" (AR 321).

> The patient at that time was very anxious and fearful of surgery and obtained a second opinion from Dr. Novack of Traverse City who offered Lupron, as well as a laparascopic hysterectomy. However, the patient was disenfranchised as he could not guarantee that this could not progress into an abdominal hysterectomy. Patient also was seen by the interventional radiology group in Traverse City and that at this time, she refuses a uterine embolization.

(AR 227). After reviewing the medical records, the ALJ concluded that plaintiff's fibroid tumors were a non-severe impairment, that she has not tried any treatment options to decrease her menstrual bleeding, and that her claim of the inability to leave home due to heavy menstrual bleeding was not substantiated by any evidence (AR 17, 229).

Based on this record, the ALJ had no duty to recontact plaintiff's treating physician (specifically Dr. Tomczyk) with respect to her fibroid tumors. Nothing in the doctor's records indicate that plaintiff suffered from a condition that prevented her performance of basic work activities. On the contrary, the doctor presented plaintiff with options to treat her alleged disabling condition, but she decided not to treat it. Plaintiff is barred from obtaining disability benefits when she fails to treat her alleged disabling condition . *See Johnson v. Secretary of Health and Human Services*, 794 F.2d 1106, 1111 (6th Cir. 1984) (an impairment that can be remedied by treatment with reasonable effort and safety cannot support a finding of disability); 20 C.F.R. § 404.1530(a) (in order to get benefits, the claimant must follow the treatment prescribed by the claimant's physician).

Accordingly, the ALJ properly developed the record in this case and did not deprive plaintiff of a fair hearing.

> **B.     Does the evidence of record document that the plaintiff is disabled and unable to perform the basic mental demands of unskilled work as described in Social Security Rulings (SSR) 85-15 and SSR 96-9p, warranting an award of benefits?**

Next, plaintiff contends that she is unable "to perform the basic mental demands of competitive, remunerative, unskilled work" as required in two SSRs. Plaintiff's Brief at 14. SSR's "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1).

SSR 85-15 provides guidance in situations where the claimant has a mental impairment that interferes with her ability to work, but is not of listing severity.

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15, 1985 WL 56857 at *4.

Plaintiff suggests that her situation is similar to SSR 85-15 "Example 1," which provides as follows:

> Example 1: A person whose vocational factors of age, education, and work experience would ordinarily be considered favorable (i.e., very young age, university education, and highly skilled work experience) would have a severely limited occupational base if he or she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations. A finding of disability would be appropriate.

*Id.*

Plaintiff further cites SSR 96-9p, which discusses the implications of a residual functional capacity for less than a full range of sedentary work. This SSR provides in pertinent part as follows:

> **Mental limitations or restrictions:** A substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), will substantially erode the unskilled sedentary occupational base and would justify a finding of disability. These mental activities are generally required by competitive, remunerative, unskilled work:
>
> * Understanding, remembering, and carrying out simple instructions.
>
> * Making judgments that are commensurate with the functions of unskilled work--i.e., simple work- related decisions.
>
> * Responding appropriately to supervision, co-workers and usual work situations.
>
> * Dealing with changes in a routine work setting.
>
> A less than substantial loss of ability to perform any of the above basic work activities may or may not significantly erode the unskilled sedentary occupational base. The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience. When an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.

SSR 96-9p, 1996 WL 374185 at *9.

The ALJ found that plaintiff can perform a significant range of heavy work. Plaintiff does not explain how SSR 96-9p, a ruling which provides guidance for evaluating individuals who can perform less than the full range of sedentary work, applies to her. Apparently, plaintiff contends that if mental limitations erode the occupational base for unskilled sedentary jobs, then those limitations will also erode the occupational base for unskilled jobs at other exertional levels. For

9

purposes of this report, the court will accept the proposition that mental limitations can erode the occupational base for jobs at all exertional levels.

Plaintiff contends that her mental impairments preclude her from performing "the basic mental demands of competitive, remunerative, unskilled work". Brief at 14. She relies on the findings of a consulting psychologist, James R. Findley, Ph. D., who interviewed her on October 3, 2003, and found that she had "moderate limitations" of functioning (AR 199-204).[4] As an initial matter, plaintiff appears to confuse the consulting opinion of Dr. Findley with the mental residual functional capacity assessment performed by Bruce G. Douglass, Ph. D. on November 24, 2003 (AR 205-08). Plaintiff relies on Section I of the assessment (the "summary conclusions"), in which Dr. Douglass found her to be moderately limited in a number of areas (AR 205-06). Plaintiff contends that a "moderate" limitation means "50%" of the time and that she has a significant loss of function. Plaintiff's Brief at 14.

Plaintiff's contention is without merit. "Section I [of the assessment] is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment." Program Operational Manual System (POMS) DI 24510.060(B)(2)(a).[5] The mental functional capacity assessment appears in Section III. POMS DI 24510.060(B)(4)(a) ("Section III—Functional Capacity Assessment, is for recording the

---

[4] Plaintiff's counsel provides no citation for this particular statement attributed to Dr. Findley.

[5] "[T]he POMS is a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims." *Davis v. Secretary of Health and Human Services*, 867 F.2d 336, 340 (6th Cir. 1989). While the POMS "does not have the force and effect of law, it is nevertheless persuasive." *Id.*

mental RFC determination. It is in this section that the actual mental RFC assessment is recorded, explaining the conclusions indicated in section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings"). Here, Dr. Douglass' mental functional capacity assessment in Section III reads as follows:

> Claimant will have trouble w complex/technical tasks. Concentration will be limited. Social is restricted. Adaptation will vary. Claimant <u>retains</u> the ability to perform simple tasks on a sustained basis.

(AR 207) (emphasis in original).

Although plaintiff had some college education and previously performed skilled work as a teaching assistant, the ALJ determined that her occupational base was limited by her mental impairments to performing simple routine tasks as determined by Dr. Douglass (AR 23). An ALJ may rely on the opinions of the state agency physicians who reviewed plaintiff's file. *See* 20 C.F.R. §§ 404.1527(f)(2)(i) and 416.927(f)(2)(i) (state agency medical consultants and other program physicians are "highly qualified physicians . . . who are also experts in Social Security disability evaluation"). In addition, the ALJ consulted with a vocational expert as contemplated by SSR 96-9p to determine the type of work that plaintiff could perform with her mental limitations (AR 343-46). Accordingly, substantial evidence supports the ALJ's conclusion that plaintiff retained the mental ability to perform a range of unskilled work.

> **C.     Did the ALJ err when he failed to discuss or even reference the results of the state agency consultative mental examination by Dr. Kristina Pikunas, Ph. D., which requires a remand and further administrative action?**

Finally, plaintiff contends that the ALJ should have considered a consultative mental examination performed by state agency psychologist Kristina Pikunas, Ph. D., in conjunction with the Dr. Findley's report. Plaintiff's Brief at 15-17. Plaintiff's bases her argument on two global assessment of functioning (GAF) scores assigned by Drs. Pikunas and Findley. The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness. American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000), pp. 32, 34. The GAF score is taken from the GAF scale, which rates individuals' "psychological, social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id*. at 32. The GAF scale ranges from 100 to 1. *Id.* at 34. At the high end of the scale, a person with a GAF score of 100 to 91 has "no symptoms." *Id.* At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.*

In an evaluation performed on June 10, 2002, Dr. Pikunas assigned plaintiff a GAF score of 48 (AR 153-58). Approximately 16 months later, on October 3, 2003, Dr. Findley assigned plaintiff a GAF score of 50 (AR 204). Both of these scores are at or near the top of the of the 41 to 50 range, which indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR*, p. 34. Plaintiff contends that the ALJ should have

viewed both of these GAF scores as indicating that plaintiff had "serious mental limitations for more than 12 continuous months." Plaintiff's Brief at 16. The court disagrees.

Dr. Pikunas' June 10, 2002 evaluation was performed approximately six weeks before plaintiff's previous disability claim was denied on July 24, 2002 (AR 15). The July 24th decision denying benefits is res judicata with respect to plaintiff's disability as it existed on that date. *See Drummond v. Commissioner of Social Security*, 126 F.3d 837, 841 (6th Cir. 1997) ("[s]ocial security claimants are bound by the principles of res judicata"). Because plaintiff did not seek to re-open the July 24, 2002 decision denying benefits, that decision establishes that she was not disabled as of that date. Accordingly, Dr. Pikunas' evaluation, which was prepared prior to the July 24, 2002 decision denying benefits, is not relevant to plaintiff's present claim of a disability, which allegedly commenced on April 7, 2003.

Even if Dr. Pikunas' GAF score was relevant, the Sixth Circuit has rejected the proposition that a determination of disability can be based solely on the unsupported, subjective determination of a GAF score. *See Rutter v. Commissioner of Soc. Sec.*, No. 95-1581, 1996 WL 397424 at *2 (6th Cir. July 15, 1996). *See generally, Hardaway v. Secretary of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987) (per curiam) ("the determination of disability must be made on the basis of the entire record and not on only some of the evidence to the exclusion of all other relevant evidence") (citation omitted). *See also* Response to Comment, Final Rules on Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746, 50764-65 (Aug. 21, 2000) ("The GAF scale . . .does not have a direct correlation to the severity requirements in our mental disorders listings").

Furthermore, Dr. Findley's other findings are not consistent with someone suffering from serious symptoms and a disabling mental condition. For example, Dr. Findley noted: that

13

plaintiff drove herself to the office and arrived promptly for her appointment; that plaintiff was dressed appropriately and well groomed; that plaintiff was a good historian reporting events in a chronological fashion; that plaintiff was generally pleasant and cooperative; and, that there was "nothing unusual about [plaintiff's] behavior or bizarre in her ideations that might suggest a thought disorder or other psychotic process" (AR 201-02).

Accordingly, substantial evidence supports the ALJ's evaluation of plaintiff's mental condition.

### IV.  Recommendation

I respectfully recommend that the Commissioner's decision be affirmed.


Dated:  January 4, 2008                             /s/ Hugh W. Brenneman, Jr.
                                                    HUGH W. BRENNEMAN, JR.
                                                    United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).